641 F.2d 574
 106 L.R.R.M. (BNA) 2513, 90 Lab.Cas. P 12,559
 Charles J. ANDERSON; Keith F. Aubol; Donald Carlson; Edward
Carter; Norman Engseth, Jr.; John Ferrazzi; Jim Forsman;
Charles Gangl; Robert Harder; Roger J. Johnson; Bendick
Larson; Hermis Laurent; Ernest McGrew; Joseph R. Marshall;
Donald Musolf; Clement D. Overfors; Rene J. Pinsonnault;
Donald Radig; Mike Ranger; James Seguin; George Simonson;
Dennis Skoglund, Sr.; Denby Stinson; Kenneth Twinning; Keith
Watters; Leonard Wick; and Duane Wilber, Appellees,
v.
UNITED PAPERWORKERS INTERNATIONAL UNION, AFL-CIO, Appellant.
 No. 80-1133.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Sept. 11, 1980.
Decided Feb. 11, 1981.
 
 Paul J. Louisell, Ltd. and Michael I. Cohen, Duluth, Minn., for appellees.
 Halverson, Watters, Bye, Downs & Maki, Ltd., William D. Watters, Steven L. Reyelts, Duluth, Minn., Benjamin Wyle, New York City, for appellants.
 Before LAY, Chief Judge, ROSS, Circuit Judge, and PORTER,* District Judge.
 LAY, Chief Judge.
 
 
 1
 Plaintiffs are former employees of W. K. Manufacturing Company, Inc. (hereafter Company), which was engaged in the manufacture of accessory parts for automobiles at plants in Mt. Clements, Michigan, and Duluth, Minnesota. The defendant, United Paperworkers International Union, AFL-CIO (hereafter Union), was the duly designated collective bargaining representative of the Company's employees. The Union's representative in the Duluth region was Carl Gear. Among Gear's principal duties were the negotiation, administration, and enforcement of the successive collective bargaining agreements entered into by the Union and Company.
 
 
 2
 Under the leadership of Carl Gear, a team of Union representatives negotiated with the Company various collective bargaining agreements which, since 1963, contained severance pay provisions. None of these agreements provided for a security fund to assure the availability of severance pay in the event of the Company's bankruptcy. Nor did such a fund exist by virtue of any agreement collateral to the collective bargaining agreement. The last collective bargaining agreement was negotiated and ratified in 1974 for the period October 1, 1974, to April 1, 1977. At meetings of the local members called for the purposes of discussing and voting on the various agreements, and particularly at such meetings held in late 1974, Carl Gear, according to testimony below, assured members of the local that a special security fund existed which guaranteed that severance pay would be available if needed. Gear knew that no such fund existed. Testimony below asserted that the employees relied on Gear's assurances in deciding to ratify the agreement in 1974 and that they would have struck had they known the truth.
 
 
 3
 In 1975, the Company went bankrupt. The employees received only portions of the severance pay due them from the Company. Plaintiffs sued the Union, alleging that Gear's misrepresentations violated the Union's duty of fair representation. The jury awarded plaintiffs $37,302.80 severance pay and $15,750.00 punitive damages against the Union. The district court also awarded plaintiffs $20,522.40 attorney's fees.
 
 
 4
 On appeal the Union raises several arguments in the alternative: (1) the plaintiffs have failed to prove that the Union has violated its duty of fair representation because the claim asserted is not related to the Union's dealings with the employer; (2) the Union is not responsible because the plaintiffs have failed to show (a) they reasonably relied on Gear's representations, (b) the Union participated in or authorized or ratified any allegedly unlawful acts, or (c) the Union caused plaintiffs' injuries; (3) the plaintiffs have failed to exhaust internal Union remedies; (4) the award of punitive damages is barred by International Brotherhood of Electrical Workers v. Foust, 442 U.S. 42, 99 S.Ct. 2121, 60 L.Ed.2d 698 (1979); and (5) the award of attorney's fees should be disallowed.
 
 
 5
 Generally, where a labor dispute involves no alleged breach of the collective bargaining agreement, jurisdiction will not lie under the Labor Management Relations Act, § 301(a), 29 U.S.C. § 185(a). Baker v. Newspaper & Graphic Communications Union, Local 6, 628 F.2d 156, 163-64 (D.C.Cir.1980). Even though this is true, federal courts may acquire jurisdiction over actions for breach of the duty of fair representation against a union under 28 U.S.C. § 1337[1], Motor Coach Employees v. Lockridge, 403 U.S. 274, 299, 91 S.Ct. 1909, 1924, 29 L.Ed.2d 473 (1971); In re Carter, 618 F.2d 1093, 1104 (5th Cir. 1980); Smith v. Local 25, Sheet Metal Workers International Association, 500 F.2d 741, 748 (5th Cir. 1974). The National Labor Relations Act is an "Act of Congress Regulating Commerce," Capital Service, Inc. v. NLRB, 347 U.S. 501, 504, 74 S.Ct. 699, 701, 98 L.Ed. 887 (1954), under which arises a union's duty to represent fairly all employees in the bargaining unit, Foust, 442 U.S. at 46 n.8, 99 S.Ct. at 2125 n.8; Vaca v. Sipes, 386 U.S. 171, 177, 87 S.Ct. 903, 909, 17 L.Ed.2d 842 (1967); Humphrey v. Moore, 375 U.S. 335, 342, 84 S.Ct. 363, 367, 11 L.Ed. 370 (1964).
 
 
 6
 The Union concedes that an action for violation of the duty of fair representation is not preempted by the National Labor Relations Act. Motor Coach Employees, 403 U.S. at 299-301, 91 S.Ct. at 1924-25; Vaca v. Sipes, 386 U.S. at 182-83, 87 S.Ct. at 912-13. The Union contends, nonetheless, that the doctrine of fair representation is limited to the Union's representation of employees in its dealings with the employer. The Union argues that the doctrine does not encompass a union's relations with the employees in the bargaining unit except as these relations involve the employer. It urges that a suit involving a union's relations with employees in the bargaining unit does not come within the Vaca v. Sipes exception to the National Labor Relations Board's exclusive jurisdiction over matters which, arguably, are unfair labor practices, San Diego Building Trades Council v. Garmon, 359 U.S. 236, 245, 79 S.Ct. 773, 779, 3 L.Ed.2d 775 (1959).
 
 
 7
 We have not directly faced this question. Cf. Augspurger v. Brotherhood of Locomotive Engineers, 510 F.2d 853 (8th Cir. 1975). In Augspurger, this court denied relief, however, because plaintiffs failed to allege that the misrepresentation of seniority rights in a merger agreement was made in bad faith. Id. at 859. Two of our sister circuits have specifically recognized the union's duty not to misrepresent deliberately union bargaining efforts and positions in order to induce ratification of a newly negotiated collective bargaining agreement. Deboles v. Trans World Airlines, Inc., 552 F.2d 1005, 1018-20 (3d Cir.), cert. denied, 434 U.S. 837, 98 S.Ct. 126, 54 L.Ed.2d 98 (1977); Retana v. Apartment, Hotel & Elevator Operators Union, Local 14, 453 F.2d 1018 (9th Cir. 1972). See also Farmer Hotel Workers, Local 1064, 99 L.R.R.M. 2166, 2186 (E.D.Mich.1978).[2]
 
 
 8
 The Union relies on Smith v. Local 25, 500 F.2d 741 (5th Cir. 1974). There the court stated:
 
 
 9
 Having viewed this contention and the record with greatest judicial imagination, we fail to see how the Union's actions could constitute a breach of the duty to represent a member of the bargaining unit fairly in dealings with the employer. A DFR breach occurs only when a union's dealings with the employer, ostensibly on behalf of a member of the bargaining unit, show that the union's conduct toward the member has been arbitrary, discriminatory, or in bad faith.
 
 
 10
 Id. at 750.
 
 
 11
 The Union urges that Smith holds that the duty of fair representation applies "only when a union deals with the employer." See also Bass v. International Brotherhood of Boilermakers, Local 582, 630 F.2d 1058, 1062-63 (5th Cir. 1980). In using the above language, the court in Smith was addressing the issue of the propriety of union expulsion of members for failure to pay dues. In affirming the grant of summary judgment the court concluded:
 
 
 12
 Appellants have not suggested that their failure to pay dues is not a proper basis for suspension or expulsion from membership. Nor do they contend that the duty of fair representation imposes upon a union the duty to open wide its doors to anyone. See Moynahan v. Pari-Mutuel Employees Guild of Cal., Loc. 280, 9th Cir. 1963, 317 F.2d 209, 211. Moreover, the appellants' claim does not demonstrate any injury to the employment relationship or to rights granted by the National Labor Relations Act.
 
 500 F.2d at 750.[3]
 
 13
 Smith, id. at 746, relies in part on Retana, 453 F.2d at 1023-24. Retana involved failure of the union to communicate the terms of the collective bargaining agreement to Hispanic employees. Deboles concerned union misrepresentations to employees for purposes of securing their ratification of the collective bargaining agreement, 552 F.2d at 1007. The allegations in both Retana and Deboles involved the bargaining unit's "dealings with the employer." The same is alleged here.
 
 
 14
 In Retana, Judge Browning noted that the complaint concerned matters related to the negotiation or administration of the collective bargaining agreement. He observed:
 
 
 15
 It is not difficult to conceive a set of facts that might be proven under the allegations of this complaint, in which a minority group of union members were effectively deprived of an opportunity to participate either in the negotiation of a collective bargaining contract or in the enjoyment of its benefits by a language barrier which union officials exploited, or took no steps to overcome. Such acts or omissions of union officials might well violate the union's duty "to make an honest effort to serve the interests" of all members of the bargaining unit.
 
 
 16
 453 F.2d at 1024 (footnote omitted).
 
 
 17
 Responding to the charge that the complaint relates to internal policies and practices, Judge Browning continued:
 
 
 18
 It is no answer to say that the complaint relates to appellee union's "internal" policies and practices. The duty of fair representation "arises out of the union-employee relationship and pervades it." Id. 400 F.2d at 106. Nothing could be more peculiarly an internal interest of a union than the control over admission to union membership that was held subject to the duty of fair representation in Wallace Corp. v. Labor Board, supra. As a practical matter, intra-union conduct could not be wholly excluded from the duty of fair representation, for as the facts of Wallace Corp. and the allegations of the present complaint suggest, internal union policies and practices may have a substantial impact upon the external relationships of members of the unit to their employer. This does not mean, as appellee union suggests, that the union will be exposed to harassing litigation by dissident members over every arguable decision made in the course of the day-to-day functioning of the union. Though the duty of fair representation is broad, not all union practices have a substantial impact upon members' rights in relation to the negotiation and administration of the collective bargaining agreement. Even as to those that do, it will be the unusual case in which hostile discrimination, bad faith, dishonesty, or arbitrary conduct can be alleged.
 
 
 19
 453 F.2d 1024-25.
 
 
 20
 We conclude that the duty of fair representation extends to the facts of this case. We need not and must not speculate whether the doctrine would extend to undefined situations.
 
 
 21
 We turn then to the Union's claims that there is no showing of reasonable reliance on Gear's misrepresentations[4] and that there is no proof the misrepresentations caused plaintiffs' injuries. We agree that the evidence fails to demonstrate any causal link between Gear's misrepresentations and the plaintiffs' injuries. We hold that the district court erred in failing to grant the judgment notwithstanding the verdict.[5]
 
 The district court stated:
 
 22
 From the testimony introduced at trial, the jury could find that the Union, through Mr. Gear, negotiated what was at best a speculative benefit; that the union members would not have ratified the collective bargaining agreement had they known it was purely speculative; that the entire pay package was tainted to the detriment of these union member employees; and that such bargaining was in bad faith.... It was for the jury to determine, under the peculiar circumstances of this case, whether the International Union representative, Carl Gear, misrepresented the Company's intentions, and whether those representations, if any, altered the Union member employees' position in regard to acceptance or rejection of the collective bargaining agreements.
 
 
 23
 484 F.Supp. at 80.
 
 
 24
 On the basis of the jury verdict, the district court held that Gear's misrepresentations caused the plaintiffs' injuries. 484 F.Supp. at 81 n.2. This conclusion assumes that, if Gear had told the truth, the employees would not have ratified the collective bargaining agreement with the severance pay provision as it stood. Furthermore, the conclusion assumes that the employees would have used their leverage to obtain and would have won from the Company a severance pay security fund. Moreover, to uphold the jury's findings and district court's judgment it would have to be assumed that the Company could afford to and would have contributed to the fund. The trial record does not support these assumptions.
 
 
 25
 The testimony in the record primarily concerns the agreement ratification meetings held from October to December 1974 for purposes of ratifying the 1974-77 collective bargaining agreement. Recollections were fresher about these 1974 meetings than about earlier ratification meetings on other agreements, and it is this 1974-77 contract, which was ratified as a result of the meetings, that governs the Company's severance pay obligations. The employees grew particularly concerned about the security of the severance pay provisions after October 1974 because there were indications that the Company was encountering financial difficulty. At the 1974 ratification meetings, Gear misrepresented the existence of a security fund. Several employees testified that they would have gone out on strike or found other jobs had they known the truth about the absence of a severance pay fund.[6]
 
 
 26
 Even crediting this self-serving testimony, it is mere speculation that an employer which had continually resisted the severance pay provision as written, had refused to establish a security fund, and was only a few months from filing for bankruptcy, would have been willing and able to establish a security fund and contribute the necessary funds to it. Even assuming that but for Gear's misrepresentations the employees would have struck in 1974 to obtain a security fund, there is no proof that they would have accomplished their objective. The plaintiffs have not proved that but for Gear's misrepresentations in 1974 they would have obtained their severance pay.
 
 
 27
 The plaintiffs assert that during the collective bargaining sessions for the 1972, 1970, 1968 or earlier contracts, the employees might have been able to obtain a severance pay security fund from the company had they known the truth about the lack of such a fund. Again, such a conclusion is merely conjectural. Even if, in these earlier years, the company was financially better able to provide a fund it is purely speculative whether it would have been more willing to do so or whether a strike could have forced the company to provide a fund. Additionally, it is purely speculative whether the employees would have struck a financially sound company over the issue of severance pay, when there were no or few indications that such pay would be needed. The concern of the employees over severance pay in these earlier years does not appear substantial, inasmuch as the proposal of a security fund was not put on the negotiating agenda, no one requested that the existence of the fund be in writing, and apparently no one made inquiries about the specific operations of the fund. Even though the plaintiffs' testimony is that Gear would suppress such inquiries by shouting at questioners and telling them "to shut up because the money was there," it cannot be said that but for Gear's statements the severance pay would have been paid.
 
 
 28
 The conclusion that the Union cannot be liable absent a showing that but for Gear's misrepresentations the severance pay would have been paid is consistent with the Supreme Court's mandate that a union be held accountable only for that portion of the employee's damages attributable to the union's breach of the duty of fair representation.[7]
 
 
 29
 Plaintiffs concede that the Union cannot be liable for losses arising from the failure of the Company to provide severance pay when it took bankruptcy. It is further conceded that the agreement did not contain any security fund for the payment of severance pay. Gear is not accused of misrepresenting the terms of the collective bargaining agreement. It is alleged only that the plaintiffs believed that the Company had somehow secured the payment because Gear generally represented this to them. Although this may be true, the actual loss or damage resulted because the Company failed to pay its obligation under the agreement, not because Gear had represented that the payment would be made.[8]
 
 
 30
 A similar claim was rejected as speculative in Barrett v. Thorofare Markets, Inc., 452 F.Supp. 880 (W.D.Pa.1978). The district court observed:
 
 
 31
 The plaintiffs cannot prove that their local would not have voted to ratify the October 4 agreement had it been submitted to them or that holding out longer would necessarily have gotten them more money. The fact of injury as well as the amount of damages on this theory must remain purely conjectural. At most, it is possible to say that if Brennan did knowingly act without authority in signing the October 4 agreement, he could be subject to internal union discipline. Therefore, summary judgment will be entered in favor of both defendants on this ground; if there was no valid contract as claimed by the plaintiffs Thorofare cannot be liable for breach of contract nor can the Union be held for breach of its duty of fair representation by failure to enforce the contract.
 
 
 32
 Id. at 883-84.
 
 
 33
 The award of compensatory damages in the stipulated amount of $37,302.80 is vacated. The award of punitive damages in the amount of $15,750.00 is vacated because the employees' injuries are not attributable to the Union's conduct. IBEW v. Foust, 442 U.S. at 50, 99 S.Ct. at 2127.[9] The district court's award of attorney's fees is vacated because the plaintiffs are no longer the prevailing party.
 
 
 34
 The Union also urged that the district court should have granted its motion for judgment notwithstanding the verdict because (1) the plaintiffs failed to exhaust internal union remedies and (2) the Norris-LaGuardia Act, § 6, 29 U.S.C. § 106, prohibits the Union from being held responsible for the alleged statements of its employee. Because of the disposition of this case, we reach neither argument, and no opinion is expressed herein on the merits of either theory.
 
 
 35
 The judgment is vacated and the cause remanded to the district court to enter judgment for the defendant union.
 
 
 
 *
 Donald J. Porter, United States District Court for the District of South Dakota, sitting by designation
 
 
 [1]
 28 U.S.C. § 1337(a) provides in pertinent part:
 The district courts shall have original jurisdiction of any civil action or proceeding arising under any Act of Congress regulating commerce or protecting trade and commerce against restraints and monopolies.
 
 
 [2]
 Other courts have recognized that some circumstances may impose an obligation on unions to provide members with information during the union's administration of the collective bargaining agreement. Courts have found breaches of the duty of fair representation where unions have failed to inform members of (1) decisions not to arbitrate grievances, Robesky v. Qantas Empire Airways Ltd., 573 F.2d 1082, 1090 (9th Cir. 1978); (2) dues increases, Brady v. Trans World Airlines, Inc., 401 F.2d 87, 99 (3d Cir. 1968), cert. denied, 393 U.S. 1048, 89 S.Ct. 680, 21 L.Ed.2d 691 (1969); and (3) dues, NLRB v. Hotel, Motel & Club Employees' Union, Local 568, 320 F.2d 254, 258 (3d Cir. 1963); International Union of Elec., Radio & Machine Workers, AFL-CIO, Frigidaire Local 801 v. NLRB, 307 F.2d 679, 683 (D.C.Cir.), cert. denied, 371 U.S. 936, 83 S.Ct. 307, 9 L.Ed.2d 270 (1962). Additionally, in Local 417, UAW (Falcon Industries, Inc.) and Cheryl Houck, 245 NLRB No. 75, 102 L.R.R.M. 1466 (Sept. 27, 1979), the Board held that the union violated the Labor Management Relations Act by willfully misinforming an employee about the status of her grievance. These cases involving administration of the collective bargaining agreement lend support to the plaintiffs' claims that the duty of fair representation includes a duty to communicate honestly with employees when explaining the terms of the collective bargaining agreement
 
 
 [3]
 Smith recognized, with regard to a claim of discriminatory job referrals by the union, that a claim for breach of the duty of fair representation may lie independent of an allegation of a breach of a collective bargaining agreement. 500 F.2d at 746. In Smith, the district court dismissed plaintiff's first claim for the union's discrimination for job referral for lack of jurisdiction under § 301 since there was no allegation that the claim involved a breach of a collective bargaining agreement. The Fifth Circuit observed in discussing an action under § 301:
 (U)nion conduct may be consistent with or even unrelated to the terms of a collective bargaining agreement and yet violative of the duty of fair representation. See Conley v. Gibson, 1957, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80; Wallace Corp. v. NLRB, 1944, 323 U.S. 248, 65 S.Ct. 238, 89 L.Ed. 216; Retana v. Apartment, Motel, Hotel & El. Op. Union, supra, 453 F.2d at 1023-1024. As the Court recently pointed out in Amalgamated Ass'n of St., E.R. & M.C. Emp. v. Lockridge, 1971, 403 U.S. 274, 299, 91 S.Ct. 1909, 1924, 29 L.Ed.2d 473, the Vaca holding goes much further than the district court or the Union would urge by bestowing on DFR suits across-the-board immunity from preemption....
 500 F.2d at 746.
 
 
 [4]
 We are bound by the jury's apparent finding that Gear did in fact misrepresent the existence of a security fund. Although our review of the record reveals conclusory, self-serving statements by both plaintiff and nonplaintiff employee witnesses, we proceed on the assumption that the jury credited these witnesses
 
 
 [5]
 The jury's apparent finding and the district court's conclusion that the employees relied on Gear's assurances and that they were injured by the failure to receive severance pay, 484 F.Supp. at 80-81, does not establish a causal link between such reliance and injury. The failure to show but-for-cause obviates an investigation as to whether the employees' reliance on Gear's assurances was reasonable. See generally Archer v. Airline Pilots Ass'n Int'l, 609 F.2d 934 (9th Cir. 1979) (if it were not reasonable to rely on the union's assurances, the union's representations would not be the cause of the plaintiff's injuries)
 
 
 [6]
 Stewards were elected by the Union member employees and participated in the negotiation of the successive collective bargaining agreements. Even though these stewards may not have possessed special negotiation skills, 484 F.Supp. at 78, they must have known that the several collective bargaining agreements contained no security fund provision. The pre-negotiation, negotiation, and ratification procedures informed the employees about the terms of the collective bargaining agreement. The stewards circulated copies of the agreements to the employees. Employee witnesses testified that the established practice was to include all agreements with the company into the collective bargaining agreement. The claim that the employees did not know the truth about the nonexistence of a security fund seems somewhat dubious, but, for purposes of this appeal, we assume the jury believed the plaintiff employees did not know the truth about the security fund
 
 
 [7]
 The factual circumstances here provide a parallel comparison to the Vaca discharge situation. In Vaca the union cannot be held liable for the wage loss but only the increase in the damages, if any, caused by the failure to process the grievance. Vaca, 386 U.S. at 197-98, 87 S.Ct. at 920-21. In the present case only the denial of severance pay was asserted as damage; no other damages were claimed
 
 
 [8]
 In a number of recent cases, courts have held unions not liable for breaches of their duty of fair representation absent evidence that but for the union's conduct the employee would not have been injured. See Deboles v. Trans World Airlines, Inc., 552 F.2d 1005, 1017-20 (3d Cir. 1977); Self v. Drivers, Chauffeurs, Warehousemen and Helpers Local Union 61, 620 F.2d 439, 443 (4th Cir. 1980). See also Soto Segarra v. Sea-Land Service, Inc., 581 F.2d 291, 298 (1st Cir. 1978); De Arroyo v. Sindicato De Trabajoderes Packinghouse, AFL-CIO, 425 F.2d 281, 290 (1st Cir.), cert. denied, 400 U.S. 877, 91 S.Ct. 117, 27 L.Ed.2d 114 (1970)
 
 
 [9]
 In their concurrence in Foust, four justices characterized the majority opinion as a per se prohibition of punitive damages against a union for breach of its duty of fair representation. 442 U.S. at 52, 99 S.Ct. at 2128. The Fifth Circuit has recognized Foust as a per se prohibition of punitive damages in fair representation cases, Wells v. Southern Airways, Inc., 616 F.2d 107, 109 n.1 (5th Cir. 1980), and the Eighth Circuit seems to have concluded likewise, Dobrena v. NLRB, 612 F.2d 1095, 1098 n.7 (8th Cir. 1980). See also Deboles, 552 F.2d at 1019; Williams v. Pacific Maritime Ass'n, 421 F.2d 1287, 1289 (9th Cir. 1970). Because of the disposition of this case, it need not be determined whether Foust states a per se prohibition against punitive damages in fair representation cases, although there is substantial authority supporting such a rule